Name  AUSA Christopher Jones

Address  312 N. Spring St.

City, State, Zip  Los Angeles, CA 90012

Phone  (213) 894-7383

Fax  (213) 894-0141

E-Mail  christopher.jones4@usdoj.gov

☐ FPD   ☐ Appointed   ☐ CJA   ☐ Pro Per   ☐ Retained

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER: |
|---|---|
| PLAINTIFF(S), | CR 25-00904-FMO |
| v. | |
| CARLITOS RICARDO PARIAS, | **NOTICE OF APPEAL** |
| DEFENDANT(S). | |

NOTICE IS HEREBY GIVEN that _____United States of America_____ hereby appeals to

*Name of Appellant*

the United States Court of Appeals for the Ninth Circuit from:

**Criminal Matter**

☐ Conviction only [F.R.Cr.P. 32(j)(1)(A)]
☐ Conviction and Sentence
☐ Sentence Only (18 U.S.C. 3742)
☐ Pursuant to F.R.Cr.P. 32(j)(2)
☐ Interlocutory Appeals
☐ Sentence imposed:

☐ Bail status:

~~**Civil Matter**~~

☒ Order (specify):
    Order Dismissing Case; CR No. 76; Filed on 12/27/2025

☐ Judgment (specify):

☐ Other (specify):

Imposed or Filed on ____12/27/2025____. Entered on the docket in this action on __12/27/2025__.

A copy of said judgment or order is attached hereto.

__12/29/2025__                          /s/ Christopher Jones
Date                                    Signature
                                        ☐ Appellant/ProSe   ☒ Counsel for Appellant   ☐ Deputy Clerk

**Note:**   The Notice of Appeal shall contain the names of all parties to the judgment or order and the names and addresses of the attorneys for each party. Also, if not electronically filed in a criminal case, the Clerk shall be furnished a sufficient number of copies of the Notice of Appeal to permit prompt compliance with the service requirements of FRAP 3(d).

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA,     )
                        )
          Plaintiff,       )
                        )
        v.              )
                        )
CARLITOS RICARDO PARIAS,     )
                        )
          Defendant.    )
_____ )

Case No. CR 25-00904-FMO

**ORDER RE: EX PARTE APPLICATION FOR ORDER DISMISSING CASE**

Having reviewed and considered all the briefing filed with respect to defendant's Ex Parte Application for Order Dismissing Case (Dkt. 54, "Application"), and the argument presented at the hearing held on December 9, 2025, the court concludes as follows.

## BACKGROUND

I.     FACTUAL AND PROCEDURAL HISTORY.

On October 21, 2025, federal law enforcement agents attempted to execute an administrative arrest warrant for Carlitos Ricardo Parias ("Mr. Parias" or "defendant"), which had been "issued in conjunction with a federal immigration proceeding[.]"  (See Dkt. 1, Complaint, Affidavit of Norman Early ("Early Affidavit") at ¶ 5).  After Mr. Parias exited his home and began driving down the street, federal agents used their vehicles to box in Mr. Parias's car.  (Id. at ¶¶ 6-7).  The agents exited their vehicles, surrounded Mr. Parias's car, and attempted to break its windows as the car's wheels spun and emitted clouds of smoke.  (Id. at ¶¶ 8-9).  Once the

1  vehicle's wheels stopped spinning, one officer reached into the vehicle through the broken window

2  of the front passenger door, brandishing a gun in one hand while attempting to open the door with

3  the other.  (Dkt. 57, Exh. A, Incident Video at 1:20-1:57).  After exchanging words with Mr. Parias,

4  who was still sitting in the driver's seat, the officer shot Mr. Parias in the arm.  (Id.); (see Dkt. 45,

5  Declaration of Gabriela Rivera ("Rivera Decl.") at ¶¶ 3, 8).

6        Later that day, the government filed a Complaint alleging that defendant committed an

7  assault on a federal officer, in violation of 18 U.S.C. § 111.  (Dkt. 1, Complaint at ECF 1).  At a

8  detention hearing held on October 31, 2025, Magistrate Judge Chooljian denied the government's

9  request for detention.  (See Dkt. 13, Court's Order of October 31, 2025, at ECF 1).  She ordered

10  defendant released under certain conditions, including that he satisfy the bail set at $15,000 by

11  posting a $5,000 cash deposit and two $5,000 unsecured affidavits of sureties.  (See id. at ECF

12  1-2).  Although defendant posted the signature bonds that same day, (see Dkts. 17 & 19), he did

13  not post the required cash deposit at that time.  (See, generally, Dkt.).  The duty district judge

14  stayed Judge Chooljian's release order after the government sought review of her order.  (See

15  Dkt. 20, Court's Order of November 4, 2025); (Dkt. 12, Application for Review).

16        The case was assigned to the undersigned on November 4, 2025, upon defendant's

17  indictment,[1] (see Dkt. 24, Indictment), and trial was set for December 30, 2025.  (Dkt. 32, Court's

18  Order of November 17, 2025).  On November 21, 2025, the government contacted the court to

19  set a hearing on its pending Application for Review.  (See Dkt. 33, Declaration of Christopher R.

20  Jones ("Jones Decl.") at ¶ 8).  That same day, the court lifted the stay on Judge Chooljian's

21  release order, set a hearing on the government's Application for Review, and ordered that

22  defendant be released forthwith.  (See Dkt. 29, Court's Order of November 21, 2025, at 2).

23        On November 24, 2025, defendant was released by the U.S. Marshal's Service into the

24  custody of the U.S. Immigration and Customs Enforcement ("ICE") pursuant to an ICE detainer.

25  (See Dkt. 34, November 24, 2025 Custody Notice at ¶ 1); (Dkt. 30, November 21, 2025 Custody

26

27  _____

28        [1]  The duty district judge accordingly declined to rule on the government's Application for
Review.  (See Dkt. 39-1, Exh. C, Review Hearing RT at 37-40).

1    Notice at ¶ 10).  That evening, ICE transferred defendant to its immigration detention facility in

2    Adelanto, California.  (Dkt. 43, November 25, 2025, Notice of Custody at ¶ 1).

3          On December 4, 2025, this court modified the release conditions set by Judge Chooljian

4    and set a December 8, 2025, deadline for defendant to post the $5,000 cash deposit.  (See Dkt.

5    49, Court's Order of December 4, 2025).  Defendant timely posted the cash deposit.  (See Dkt.

6    50, Cash Security Affidavit).  On December 9, 2025, the court held a hearing on the government's

7    pending Application for Review, which it denied for the reasons stated on the record.  (See Dkt.

8    52, Court's Order of December 9, 2025).

9    II.    DEFENDANT'S ACCESS TO COUNSEL.

10         On November 26, 2025, two days after defendant was taken into ICE custody, defense

11   counsel filed a declaration that addressed, among other things, the challenges to defendant's

12   access to counsel resulting from his detention in Adelanto.  (See Dkt. 45, Rivera Decl. at ¶¶ 2, 7-

13   13).  Defense counsel explained that upon learning of her client's detention in Adelanto, which is

14   "an approximately a two-hour drive away from [defense counsel's] office in Downtown Los

15   Angeles[,]" (id. at ¶ 13), the defense team "immediately began making efforts to schedule a legal

16   visit with" him.  (Id. at ¶ 10).  However, the defense team was unable to conduct an in-person visit

17   or arrange a virtual legal visit with defendant.[2]  (Id.).  According to defense counsel, "[s]ince Mr.

18   Parias's initial appearance, [she] ha[s] had grave concerns" that the detention of her client in

19   Adelanto for any length of time would "interfere with [her] ability to adequately represent him[.]"

20   (Id. at ¶ 12).  Counsel's concern was rooted in awareness "from [her] own experience, from that

21   of [her] colleagues, and from concerns raised by advocates that legal representation of persons

22   detained at Adelanto can [be] incredibly difficult, as there are numerous barriers to having the

23   privileged conversations that would be necessary in order to adequately prepare Mr. Parias's

24   defense."  (Id. at ¶ 13).

25

26         [2] The defense team's initial inability to schedule a virtual legal visit apparently stemmed from
27   their lack of access to defendant's A-number, the immigration file number assigned by DHS.  (See
     Dkt. 45, Rivera Decl. at ¶ 10).  However, the defense team ultimately obtained defendant's A-
28   Number after requesting it from government counsel.  (See id.).

At a hearing held on December 9, 2025, the government conceded that Mr. Parias's detention was adversely affecting his right to counsel. (December 9, 2025, Hearing RT at 13).[3] Specifically, the government's counsel stated that she did not dispute that Adelanto was far away, nor that Mr. Parias's detention in Adelanto made it more difficult for him to access his counsel than if he were being detained in downtown Los Angeles. (Id.). However, the government's recommendation for ameliorating this issue was for the court to reverse its bail decision and order that defendant be detained pending trial. (Id.). By doing so, the government suggested, the court could ensure that defendant would be transferred to the custody of the U.S. Marshal in downtown Los Angeles, thus alleviating the access to counsel problem. (Id.).

The next day, another member of the defense team, Cuauhtemoc Ortega, the Federal Public Defender for the Central District of California, provided an updated account of the access to counsel challenges posed by defendant's immigration detention in Adelanto. (See Dkt. 54, Declaration of Cuauhtemoc Ortega ("Ortega Decl.")). With less than three weeks before trial, Mr. Ortega explained that they had been unable to schedule any legal visits with Mr. Parias since the beginning of his ICE detention over two weeks earlier. (See id. at ¶¶ 5-7). As for in-person visits, defense counsel explained that "the detention center is almost a 2-hour drive each way from downtown Los Angeles," and that "[c]arving out a four-hour block of driving time per visit is not a reasonable expectation for busy federal practitioners less than a month from the beginning of trial." (Id. at ¶ 5).

Further, although the defense team called the Adelanto detention facility on December 2, 2025, to schedule a video-telephone conference ("VTC") visit, they were unable to do so. (See Dkt. 54, Ortega Decl. at ¶ 6). Instead, the Adelanto operator who answered the call stated that an individual named Ms. Camargo[4] is in charge of scheduling visits, and that she (the operator) had been "fielding complaints for the last couple of weeks that [Ms.] Camargo fails to return calls

---

[3] The facts in this paragraph are drawn from the court's review of the rough transcript of the December 9, 2025, hearing prepared by the court reporter.

[4] Ms. Camargo was identified to the defense by only her last name, and therefore the court is unaware of her full name. (See Dkt.54, Ortega Decl. at ¶ 6).

or schedule visits." (Id.) (internal quotation marks omitted). The operator assured defense counsel that Ms. Camargo would eventually return their calls, and transferred counsel to voicemail. (Id.). As of the filing date of the Application, eight days had passed since reaching the voicemail and the defense team was still unable to schedule a VTC visit. (Id.).

On December 12, 2025, in connection with its Opposition to Defendant's Ex Parte Application for Order Dismissing Case with Prejudice ("Opposition"), the government filed a declaration signed under penalty of perjury by Deportation Officer Jolene Velasquez that provided "factual statements based on [her] personal knowledge" about procedures governing attorney access to detainees at the Adelanto detention facility. (See Dkt. 61-1, Declaration of Jolene Velasquez ("Velasquez Decl.") at ¶ 3-11). She stated that "[a]ll attorneys are provided with access to their client via" the same protocols, which are set forth on the Adelanto detention facility's website and in the GEO[5] attorney visitation policy ("Visitation Policy") attached to her declaration. (See id. at ¶ 5); (Dkt. 61-2, Exh. 1, Visitation Policy). Officer Velasquez stated that although attorney appointments are generally limited to one-hour blocks, "[i]n this particular case and under these specific circumstances, ICE will waive the one-hour time limit." (Dkt. 61-1, Velasquez Decl. at ¶ 6). She also declared that attorney walk-in visits are allowed "24 hours a day, 7 days a week," and that the Adelanto detention facility would accommodate defense counsel's "request to visit the defendant every day between the hours of 8 AM and 8 PM." (Id. at ¶¶ 7-8). However, while the Visitation Policy states that legal visits are authorized 24 hours a day, it also states that scheduling legal visits must be done "through ERO eFile during the hours of: 8 a.m. to 10 a.m. or 12 p.m. to 5 p.m. Monday through Friday." (Dkt. 61-2, Exh. 1, Visitation Policy at ECF 7). The Visitation Policy also provides that VTC appointments are "subject to availability during the following times: 8 a.m. to 10 a.m. or 12 p.m. to 5 p.m. Monday through Friday." (Id. at ECF 7-8).

---

[5] While the Velasquez Decl. does not elaborate as to the identity of GEO, it appears she is referring to "GEO Group, Inc.," the entity that operates the Adelanto detention facility "under contract with ICE[.]" See Torres v. U.S. Dep't of Homeland Sec., 2020 WL 3124216, *1-2 (C.D. Cal. 2020).

Diana Miner, the executive legal assistant to Mr. Ortega, stated in her declaration that she contacted the Adelanto detention facility by e-mail on Friday, December 12, 2025, to schedule a VTC meeting between defense counsel and Mr. Parias for the following Tuesday, December 16, 2025. (See Dkt. 63, Declaration of Diana Miner ("Miner Decl.") at ¶¶ 1-2; (Dkt. 63-1, Exh. 1, December 12, 2025, Email at ECF 2). Ms. Miner received an e-mail response that same day from Officer Stephanie Torres, who informed her that attorney appointments could be made "through EROeFile at Adelanto ICE Processing Center or by calling (760) 561-6208." (Dkt. 63-1, Exh. 1, December 12, 2025, Email at ECF 2). Ms. Miner then called the phone number in the email response, but Ms. Torres, who answered the phone, "declined to schedule the VTC appointment[,]" explaining "that because Mr. Ortega is a criminal defense attorney and not an immigration attorney, [the defense team] needed 'ICE's permission' prior to scheduling calls." (See Dkt. 63, Miner Decl. at ¶ 4). That same afternoon, Ms. Miner sent an e-mail to the e-mail address provided by Ms. Torres, requesting ICE's authorization for defense counsel to schedule a VTC visit with Mr. Parias. (Id.); (Dkt. 63-2, Exh. 2, December 12, 2025, Email at ECF 2). Ms. Miner received a response to her December 12, 2025, e-mail on December 16, 2025 – the day she had requested for the VTC meeting – from Deportation Officer "D. Riley" who stated that "an influx of attorney visits" had "caused scheduling to be pushed back and wait times to become longer." (See Dkt. 65-1, Exh. 9, December 16, 2025, Email at ECF 2-3). According to Officer Riley, "there is a high possibility that [defense counsel's] visit [with Mr. Parias] will not be scheduled in time." (Id. at ECF 2).

On December 15, 2025, while awaiting authorization for a VTC visit with defendant, Ms. Miner attempted to schedule a legal telephone call between defense counsel and Mr. Parias by following the instructions laid out in the Visitation Policy. (See Dkt. 63, Miner Decl. at ¶ 6). Ms. Torres again answered Ms. Miner's phone call, and again "stated that she could not schedule a call because [the attorneys] are criminal defense attorneys" who lacked "prior consent from ICE to communicate with the detainee." (Id.). Ms. Torres then directed the defense to apply for permission by submitting a form through ERO eFile, which was "a change from her prior instructions" to obtain authorization via e-mail. (See id. at ¶¶ 4, 6). When Ms. Miner explained

6

1    that the Visitation Policy attached to the Velasquez Decl. stated that legal calls could be

2    scheduled by phone, Ms. Torres replied, "I don't know who Velasquez is, and I have been

3    instructed that if someone discloses that they are criminal attorneys representing a detainee they

4    must have permission from ICE allowing [them] to schedule telephonic or other visits." (Id. at ¶

5    6) (internal quotation marks omitted).

6           To seek clarification of some the statements made in Ms. Velasquez's declaration, the

7    defense team – including Mr. Ortega, Ms. Miner, and Ms. Marvely Rivera, an investigator for the

8    Federal Public Defender – attempted to reach Ms. Velasquez by phone on December 15, 2025.

9    (Dkt. 63, Miner Decl. at ¶¶ 8-9); (Dkt. 63, Declaration of Marvely Rivera ("M. Rivera Decl.") at ¶¶

10   1-2).  The defense team began calling Ms. Velasquez at 9:28 a.m., but did not receive a call back.

11   (Dkt. 63, M. Rivera Decl. at ¶ 2).  After calling Ms. Velasquez several times, they were ultimately

12   able to reach her at 2:33 p.m. (Id.).  Ms. Velasquez "confirmed that ICE needs to approve criminal

13   defense attorney visits because they are not counsel of record in immigration cases."[6]  (Dkt. 63,

14   Miner Decl. at ¶ 9).  Ms. Miner then informed Ms. Velasquez that she had sought approval by e-

15   mail on December 12, 2025, but had not heard back.  (Id.).  Ms. Velasquez could not locate Ms.

16   Miner's e-mail, and "[a]fter approximately 10-15 minutes of back and forth," stated that Ms. Miner

17   had been provided with the wrong e-mail address and provided her with the correct one.  (Id.).

18   Upon receiving the defense team's e-mail at the correct e-mail address, Ms. Velasquez "stated

19   Mr. Ortega could now visit Mr. Parias."  (Id.).  Although the defense team repeatedly requested

20   that Ms. Velasquez provide them with confirmation of the approval, she was unable to provide any

21   form of confirmation, and simply stated that she would "send an email to ensure people were

22   aware."  (Id.) (internal quotation marks omitted).

23          On December 15, 2025, Ms. Miner also registered defense counsel for ERO eFile in order

24   to schedule a legal call for December 17, 2025, in anticipation of the pretrial conference then

25   scheduled for December 18, 2025.  (Dkt. 63, Miner Decl. at ¶ 10).  When Ms. Miner attempted

26   _____

27        [6]  Ms. Velasquez's declaration does not indicate whether or why criminal defense attorney are
     subject to restrictions on client access that do not apply to civil immigration attorneys.  (See,
28   generally, Dkt. 61-1, Velasquez Decl.).

1   to schedule the call, "Adelanto's system stated that the soonest a call or VTC could be
2   schedule[d] is 10 days from today, on Christmas morning."  (Id.); (Dkt. 63-3, Exh. 3, Legal Visit
3   Video Schedule at ECF 6) (displaying earliest date and time for video appointment as December
4   25, 2025, at 8:00 a.m.); (Dkt. 63-4, Exh. 4, Legal Visit Phone Schedule at ECF 6) (displaying
5   same date and time as earliest available opportunity for a phone call).  Beyond the appointments
6   available on December 25 and 26, 2025, and the fact that trial is scheduled for December 30,
7   2025, "there was no availability at all for the month of January, February, March, April, or May for
8   either legal calls []or VTC meetings."  (Dkt. 63, Miner Decl. at ¶ 12); (see Dkt. 63-5, Exh. 5,
9   January 2026 Legal Visit Schedule at ECF 2-10) (displaying no January 2026 availability for
10  phone calls).

11      When Ms. Miner "asked Officer Velasquez if anything could be done to expedite the
12  availability of a VTC call or phone [call], . . . [Ms. Velasquez] said she was not aware of how it
13  could be expedited or to whom an appeal can be lodged."  (Dkt. 63, Miner Decl. at ¶ 14).  Also,
14  "Officer Velasquez seemed unfamiliar with a portion of paragraph 6 of her declaration," which
15  stated that ICE would waive the one-hour time limit for attorney appointments in Mr. Parias's case.
16  (See id. at ¶ 15); (Dkt. 61-1, Velasquez Decl. at ¶ 6).  Ms. Velasquez "was unaware of any specific
17  or special accommodations made for Mr. Parias' case[,]" (Dkt. 63, Miner Decl. at ¶ 15), although
18  she stated otherwise in her declaration.  (See Dkt. 61-1, Velasquez Decl. at ¶ 6).  Additionally,
19  when "questioned about the inconsistency between her declaration" and the Visitation Policy
20  regarding the timeframe during which legal visits can be scheduled, Ms. Velasquez "conceded that
21  the 8 AM to 8 PM time bracket" described in her declaration "is not exactly accurate."  (Dkt. 63,
22  M. Rivera Decl. at ¶ 3).  Instead, Ms. Velasquez informed the defense team that legal visits could
23  not be scheduled:  (1) "during 'count,' which runs from approximately 10:30 AM to 11:30 AM"; (2)
24  "in the time leading up to count"; (3) during the afternoon count, which "starts at approximately
25  3:00 PM"; or (4) during any of the other counts during the day, the times of which Ms. Velasquez

26

27

28

1  could not recall.[7]  (Id.).  According to defense counsel, in light of the many obstacles caused by

2  ICE and its detention of defendant, they have  "not been able to travel to Adelanto to see Mr.

3  Parias even once[,]" nor have they "been able to review any discovery with him."  (Dkt. 63,

4  Supplemental Declaration of Cuauhtemoc Ortega ("Ortega Supp. Decl.") at ¶¶ 2-3).

5  III.    THE GOVERNMENT'S PROSECUTION OF THE CASE.

6         The discovery cutoff in this case was December 5, 2025.  (Dkt. 42, Court's Case

7  Management Order of November 25, 2025, at 11).[8]  The defense made its initial discovery request

8  on October 28, 2025 in advance of the detention hearing set for October 31, 2025.  (See Dkt. 45,

9  Rivera Decl. at ¶ 11).  The request included, among other things, a request for the administrative

10 arrest warrant for Mr. Parias referenced in the Complaint, and the relevant surveillance videos.

11 (See Dkt. 4, Defendant's Bail Brief at 2 n. 1).  Inexplicably, the government informed defense

12 counsel that it would not produce any requested material in advance of the October 31, 2025,

13 detention hearing.  (Id.).

14        In fact, the government did not produce any discovery until November 26, 2025, nearly a

15 month after defendant made his initial discovery requests.  (Dkt. 45, Rivera Decl. at ¶ 11) ("[T]he

16 government has not produced any discovery in this case. . . .  I understand that the government

17 intends to make an initial production of some discovery today, November 26.  As of the time of

18

19

20        [7] Defense "[c]ounsel understands 'count' to mean when the facility is checking on the physical presence of every detainee."  (Dkt. 63, Reply at 6).

21        [8] As noted by the government, the court issued its Case Management Order ("CMO") on

22 November 25, 2025.  (Dkt. 64, Declaration of Christopher Jones In Support of Henthorn Deadline Extension ("Jones Henthorn Decl.") at ¶ 2).  This was only ten days prior to the discovery deadline

23 of December 5, 2025.  (See Dkt. 42, Court's Case Management Order of November 25, 2025, at 11).  However, the Indictment was issued on November 4, 2025, (Dkt. 24, Indictment), and

24 defense counsel made their first discovery request on October 28, 2025.  (Dkt. 45, Rivera Decl. at ¶ 11).  Further, while the CMO was issued later than is the court's usual practice, this

25 unfortunately has become a common occurrence given the government shutdown and the judiciary's budget shortfalls, which has caused delays and backlogs in many court functions,

26 including the docketing of orders.  In any event, this court's deadlines and requirements – which

27 are tethered to the trial date – have been the same for years, and the court is aware that the U.S. Attorney's Office has charts and/or a system in place that sets forth the deadlines and

28 requirements for all of the judges.

9

1  this filing, we have not yet received any discovery."); (Dkt. 64, Jones Henthorn Decl. at ¶ 9 n. 1)

2  ("[T]he government produced discovery on or about November 26, 2025, December 3, 2025, and

3  December 5, 2025.").  The government has continued to produce discovery to the defense well

4  beyond the discovery cutoff.  For example, the government produced the "body-worn camera

5  footage" worn by the officer who shot Mr. Parias on December 10, 2025, the day the instant

6  Application was filed, and five days after the discovery cutoff.  (See Dkt. 66, Supplemental

7  Declaration of Gabriela Rivera ("Rivera Supp. Decl.") at ¶ 7a).  And in a stipulation for a protective

8  order filed on December 18, 2025, just 12 days before trial, the government stated that it "intends

9  to produce" further discovery, (see Dkt. 69, Stipulation and Joint Request for Protective Order at

10  ¶ 2), despite the discovery cutoff deadline.

11      Additionally, the government did not comply with the deadline for disclosing information to

12  the defense under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  (See Dkt. 64, Jones

13  Henthorn Decl. at ¶ 9) (acknowledging that government failed to complete its Henthorn review by

14  the deadline).  In requesting an extension of the Henthorn deadline, counsel for the government

15  noted that he attended a training in South Carolina from December 1 to December 11, 2025, –

16  just weeks before the start of trial.  (Id. at ¶¶ 9-10).  However, the government apparently failed

17  to appoint another attorney to work with or take over the case in Mr. Jones's absence.  Instead,

18  at case-related hearings held on December 4 and 9, 2025, Assistant U.S. Attorneys with little

19  knowledge of the case appeared on Mr. Jones's behalf.

20                                  **LEGAL STANDARD**

21      A court may exercise its inherent supervisory powers to dismiss an indictment "to remedy

22  a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests

23  on appropriate considerations validly before a jury; or to deter future illegal conduct."  United

24  States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991).  Where a request to dismiss is

25  predicated upon the violation of defendant's rights, "[d]ismissal is appropriate when the

26  investigatory or prosecutorial process has violated a federal constitutional or statutory right and

27  no lesser remedial action is available."  Id. at 1092; see also United States v. Chapman, 524 F.3d

28  1073, 1087 (9th Cir. 2008) ("A court may dismiss an indictment under its supervisory powers only

1    when the defendant suffers substantial prejudice, and where no lesser remedial action is

2    available[.]") (internal citations and quotation marks omitted).   In the context of a Sixth

3    Amendment violation, dismissal of the indictment is inappropriate "absent demonstrable prejudice,

4    or substantial threat thereof[.]" <u>United States v. Morrison</u>, 449 U.S. 361, 365, 101 S.Ct. 665, 668

5    (1981).

6                                             **<u>DISCUSSION</u>**

7    I.    SIXTH AMENDMENT RIGHT TO COUNSEL.

8              The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions,

9    the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."   U.S.

10   Const. amend. VI.   "The core of this right has historically been, and remains today, the opportunity

11   for a defendant to consult with an attorney and to have him investigate the case and prepare a

12   defense for trial." <u>Kansas v. Ventris</u>, 556 U.S. 586, 590, 129 S.Ct. 1841, 1844-45 (2009) (internal

13   quotation marks omitted).   Critically, "the assistance of counsel cannot be limited to participation

14   in a trial[.]" <u>Maine v. Moulton</u>, 474 U.S. 159, 170, 106 S.Ct. 477, 484 (1985).   Instead, "[t]he right

15   attaches at or after the time that judicial proceedings have been initiated against [the defendant],"

16   and "[o]nce the right attaches, the defendant is guaranteed counsel during any critical stage of

17   the postattachment proceedings." <u>Betschart v. Oregon</u>, 103 F.4th 607, 619-620 (9th Cir. 2024)

18   (internal quotation marks omitted).   "[T]he period from arraignment to trial [is] perhaps the most

19   critical period of the proceedings, during which the accused requires the guiding hand of counsel[]

20   if the guarantee is not to prove an empty right." <u>United States v. Wade</u>, 388 U.S. 218, 225, 87

21   S.Ct. 1926, 1931 (1967) (internal citations and quotation marks omitted).   As the U.S. Supreme

22   Court has explained, "to deprive a person of counsel during the period prior to trial may be more

23   damaging than denial of counsel during the trial itself." <u>Moulton</u>, 474 U.S. at 170, 106 S.Ct. at

24   484; <u>see</u> <u>also</u> <u>Daniels v. Woodford</u>, 428 F.3d 1181, 1197 (9th Cir. 2005) ("The Supreme Court has

25   repeatedly held that a defendant's Sixth Amendment right to counsel is violated if the defendant

26   is unable to communicate with his or her counsel during key trial preparation times.").

27             The government contends that defendant's request for dismissal of the indictment should

28   be denied because:  (1) defendant has reasonable access to counsel even while detained in

1  Adelanto; and (2) defendant has not shown "continuing prejudice" warranting dismissal. (See Dkt.

2  61, Opposition at 8-10). The government primarily relies on United States v. Lucas, 873 F.2d

3  1279 (9th Cir. 1989) for the proposition that the mere remoteness of defendant's detention does

4  not deprive him of reasonable access to counsel. (See Dkt. 61, Opposition at 8-9). In Lucas, the

5  court noted that the defendant's "pretrial detention in a facility located two hours from the place

6  of his trial did not prevent all communications between client and counsel. Lucas and his counsel

7  were free to communicate by telephone; alternatively, Lucas's counsel could easily endure the

8  inconvenience of a two-hour drive to Phoenix." 873 F.2d at 1280.

9        But unlike in Lucas, the access-to-counsel issues present in this case involve far more than

10  the driving distance between defense counsel and their client. Here, defendant's detention in

11  Adelanto has effectively denied him access to his counsel for nearly the entire month preceding

12  trial. Mr. Parias is not "free" to communicate with his attorneys by telephone. As explained

13  above, although the defense team attempted to schedule a VTC meeting for December 16, 2025,

14  (Dkt. 63, Miner Decl. at ¶¶ 2-4); (Dkt. 63-1, Exh. 1, December 12, 2025, Email at ECF 2), and

15  a legal call for December 17, 2025, (Dkt. 63, Miner Decl. at ¶ 10), the defense learned that the

16  earliest available time slot for a VTC or phone call with their client was on Christmas Day – which,

17  beyond being a major holiday, is just five days before the beginning of trial. (Dkt. 63, Miner Decl.

18  at ¶ 10); (see Dkt. 42, Court's Case Management Order of November 25, 2025, at 12). Next,

19  although it may have been possible for defense counsel in Lucas to "easily endure" a two-hour

20  drive in the desert between Phoenix and Tucson nearly 40 years ago, see 873 F.2d at 1280, that

21  is clearly not the situation today, where traveling from downtown Los Angeles to the high desert

22  of San Bernardino County can easily exceed three hours each way during working hours.

23  (See Dkt. 54, Ortega Decl. at ¶ 5); (Dkt. 63, M. Rivera Decl. at ¶ 4); (Dkt. 63-7, Exh. 7, GPS Map

24  at ECF 2-3) (reflecting driving directions generated at 3:48 p.m.). Moreover, setting aside the

25  duration of the necessary travel time and waiting time at the facility, ICE did not even grant

26  defense counsel permission to visit Mr. Parias in Adelanto until December 15, 2025,

27  approximately three weeks after he was first detained in Adelanto. (See Dkt. 63, Miner Decl. at

28  ¶ 9); (Dkt. 43, November 25, 2025, Notice of Custody at ¶ 1). Thus, any effort by defense counsel

during those three weeks to endure hours of travel and waiting time at the facility to meet with their client would have been futile.  And given the many difficulties involved in scheduling and traveling to Adelanto, defense counsel has not, as of December 15, 2025, "been able to travel to Adelanto to see Mr. Parias even once."  (Dkt. 63, Ortega Supp. Decl. at ¶ 2).  In short, the obstacles and roadblocks that ICE has put in place at Adelanto make it difficult, if not impossible, for defendant to meet with his attorneys, and have caused defendant to suffer demonstrable prejudice or a substantial threat thereof.

Moreover, the prejudice to Mr. Parias has been exacerbated by the government's conduct especially as it relates to meeting deadlines and producing discovery.  (See Dkt. 54, Ortega Decl. at ¶ 8); (Dkt. 63, Ortega Supp. Decl. at ¶ 4); (Dkt. 63-8, Exh. 8, Discovery Email at ECF 2) (reflecting government production of discovery on December 15, 2025); (Dkt. 42, Court's Case Management Order of November 25, 2025, at 11); (Dkt. 69,  Stipulation and Joint Request for Protective Order at ¶ 2) (stipulation filed on December 18, 2025 – 12 days before the start of trial – reflecting that "the government intends to produce to the defense" additional discovery).  As an initial matter, "the government ha[d] not produced any discovery in this case" until November 26, 2025 – nearly a month after defendant made his initial discovery request.  (See Dkt. 45, Rivera Decl. at ¶ 11).

Further, the government did not produce the body-worn camera footage recorded by the law enforcement officer who shot Mr. Parias until December 10, 2025 – five days after the discovery cutoff – despite the fact that "the defense has been requesting such video recordings since October 28, 2025."  (Dkt. 66, Rivera Supp. Decl. at ¶ 7a).  By delaying production of the body camera footage, the government eliminated any possibility for the defense to review the footage with Mr. Parias.  And with each passing day, the ability of defense counsel to meet with their client and prepare for trial was further undermined, resulting in even more prejudice to defendant.  Needless to say, "[s]ubstantial prejudice result[ed] from" such conduct, which has, in effect, "give[n] the prosecution an unfair advantage at trial."  See Williams v. Woodford, 384 F.3d 567, 585 (9th Cir. 2004); see, e.g., Doggett v. United States, 505 U.S. 647, 654, 112 S.Ct. 2686, 2692 (1992) (explaining that in the context of Sixth Amendment speedy trial violations, the most

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 15 of 29    Page ID
#:536
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 14 of 28    Page ID
#:504

1    serious form of prejudice is "the possibility that the [accused's] defense will be impaired," because
2    "the inability of a defendant adequately to prepare his case skews the fairness of the entire
3    system").

4         The government's reliance on United States v. Zarate, 2019 WL 6493927 (D. Nev. 2019),
5    (see Dkt. 61, Opposition at 9-10), is unpersuasive.  In Zarate, a defendant released pending trial
6    was placed in ICE detention pending her removal proceedings.  2019 WL 6493927, at *1.  After
7    the defendant twice missed her arraignment, her counsel "advised the court that ICE also denied
8    [counsel] visitation with Zarate while she was housed at the ERO."  Id. at *2.  "Once it learned of
9    these issues, the government contacted ERO about defense counsel's visitation privileges, and
10   the ERO issued a memorandum of understanding allowing criminal defense counsel to visit their
11   clients at ERO."  Id.  Despite this apparent resolution, Zarate's counsel filed a motion to dismiss
12   the indictment before she had even been arraigned.  Id.  The district court adopted the magistrate
13   judge's report and recommendation to deny the motion, finding that "Zarate does not even
14   approach 'demonstrable prejudice' from the short period that her counsel was unable to meet with
15   her."  Id. at *4.

16        The facts in Zarate bear little resemblance to the circumstances here.  First, Mr. Parias has
17   not been deprived of his access to counsel for a "short period."  As noted above, the defense
18   team was not even granted permission to visit Mr. Parias until December 15, 2025, (Dkt. 63, Miner
19   Decl. at ¶ 9) – three weeks after he was first detained by ICE, (Dkt. 43, Nov. 25, 2025 Custody
20   Notice at ¶ 1), and two weeks before trial.  The prejudicial effect of this obstacle was not merely
21   theoretical.  Although the defense team contacted Adelanto on December 12 and 15, 2025, to
22   schedule, respectively, a VTC meeting and a legal phone call, Ms. Torres declined both
23   scheduling requests because Mr. Parias's counsel were criminal defense attorneys, not
24   immigration attorneys, who lacked prior consent from ICE to communicate with Mr. Parias.  (See
25   Dkt. 63, Miner Decl. at ¶¶ 2-4, 6).  And even after ICE granted defense counsel permission on
26   December 15, 2025, to communicate with their client, defense counsel was informed they could
27   not speak with him by phone or VTC until ten days later – on Christmas Day – at the earliest.  (Id.
28   at ¶ 10).

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 16 of 29    Page ID
#:537
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 15 of 28    Page ID
#:505

1      Second, the U.S. Attorney's Office did not coordinate with ICE to resolve the access to

2   counsel issue during the nascent stages of Mr. Parias's criminal proceedings.[9]  To the contrary,

3   Mr. Parias has been denied the assistance of counsel for most of the month immediately

4   preceding his trial's start date.  Further, as noted earlier, "defense counsel has not been able to

5   review any discovery with" Mr. Parias, (Dkt. 63, Ortega Supp. Decl. at ¶ 3), "which in turn has

6   limited [their] ability to investigate his case and draft motions" for a "case [that] involves

7   significantly contested issues of fact that the defense needs to investigate, including by reviewing

8   video footage and reports with Mr. Parias." (Dkt. 54, Ortega Decl. at ¶¶ 8-9).  Indeed, "because

9   of the lack of access to [their] client," the defense was unable to meet "[t]he Court's December

10  4, 2025, motion filing deadline."  (Dkt. 54, Ortega Decl. at ¶ 8); (see Dkt. 42, Court's Case

11  Management Order of November 25, 2025, at 11-12).  Counsel's inability to review discovery with

12  defendant and resulting inability to file related motions on defendant's behalf clearly "has had or

13  threatens some adverse effect upon the effectiveness of counsel's representation[,]" so as to

14  constitute prejudice.  See Morrison, 449 U.S. at 365, 101 S.Ct. at 668.

15     While the court's finding and conclusions concerning the Sixth Amendment violation are

16  sufficient to independently resolve defendant's Application, the court will also address the

17  arguments raised by the parties regarding the interaction of the Immigration and Nationality Act

18  ("INA"), 8 U.S.C. §§ 1101, et seq., and the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141 et seq.

19  II.    THE BRA AND THE INA.

20     "The interplay between the BRA and the INA has caused both confusion and tension[,]"

21  United States v. Trujillo-Alvarez, 900 F.Supp.2d 1167, 1176 (D. Or. 2012), particularly when, as

22  here, the executive elects "to proceed concurrently with a criminal prosecution and removal

23  proceedings[.]"   United States v. Rangel, 318 F.Supp.3d 1212, 1219 (E.D. Wash. 2018).

24

25     [9]  Indeed, lead government counsel was absent from the two hearings on December 4 and 9,
    2025, where the issue of Mr. Parias's detention by ICE was discussed.  As noted earlier, he was
26  attending training out of state from December 1, 2025 to December 11, 2025, (Dkt. 64, Jones
    Henthorn Decl. at ¶ 10), and the government failed to appoint another Assistant U.S. Attorney to
27  take over the case.  Instead, other Assistant U.S. Attorneys with little knowledge of the case
    appeared at those hearings on counsel's behalf to cover him, and they evidently did not
28  coordinate with ICE to ensure Mr. Parias's access to counsel.

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 17 of 29    Page ID
#:538
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 16 of 28    Page ID
#:506

1    Congress anticipated the overlap between the Executive Branch's prosecutorial and removal

2    obligations and provided express provisions to allow the government to harmonize the actions of

3    its agencies.  See, e.g., Trujillo-Alvarez, 900 F.Supp.2d at 1179 (analyzing 18 U.S.C. § 3142(d)

4    to demonstrate that "in the BRA itself Congress explained how to reconcile the release and

5    detention provisions of that statute with the administrative deportation provisions of the INA").  But

6    when the government fails to coordinate and harmonize those actions as Congress intended, it

7    can jeopardize a criminal defendant's constitutional rights – as occurred here.

8        A.    The BRA Strikes a Careful Balance Between Pretrial Release and Removal

9              Proceedings Through 18 U.S.C. § 3142(d).[10]

10       The BRA provides a specific framework to allow the government to prioritize removal

11   proceedings over criminal prosecution.  That process is codified at § 3142(d), which the Ninth

12   Circuit reviewed in detail in United States v. Santos-Flores, 794 F.3d 1088 (9th Cir. 2015).  There,

13   the court explained that:

14           Congress chose not to exclude removable aliens from consideration for

15           release or detention in criminal proceedings.  The Bail Reform Act does,

16           however, provide specific procedures to be followed when a judicial officer

17           determines that a defendant is not a citizen of the United States or lawfully

18           admitted for permanent residence.  18 U.S.C. § 3142(d).

19   Id. at 1090-91 (internal citation omitted).  In such cases, the "judicial officer must determine

20   whether such an alien may flee or pose a danger to any other person or the community."  Id. at

21   1091 (citing § 3142(d)(2)).  "If so, the judicial officer shall order temporary detention for not more

22   than ten days, and direct the attorney for the government to notify" the appropriate federal

23   immigration officials.  Id.  Critically, "[i]f the immigration official does not take custody of the

24   defendant during that ten-day period, Congress directs the court to treat the defendant in

25   accordance with the other provisions of the Bail Reform Act, notwithstanding the applicability of

26

27   _____

28       [10]  Unless otherwise indicated, all further section references are to Title 18 of the United States
     Code.

1    other provisions of law governing release pending trial or deportation or exclusion proceedings."

2    Id. (internal quotation marks omitted).

3        The Ninth Circuit emphasized in Santos-Flores that in determining whether to prioritize

4    immigration detention to proceed with removal proceedings, the government has a choice:  it may

5    "exercise its judgment that the public interest in criminally prosecuting an alien is greater than the

6    public interest in swiftly removing him.  The government may, therefore, elect to deliver the alien

7    to the United States Attorney's Office for prosecution, as it did here, instead of removing him

8    immediately[.]"  794 F.3d at 1091.  "Section 3142(d) makes the dichotomous nature of criminal

9    and immigration proceedings clear."  Rangel, 318 F.Supp.3d at 1218.  Indeed, the structure of

10   § 3142(d) envisions government cooperation to ensure that federal prosecutors and immigration

11   officials agree as to their chosen course of action.

12       First, it is noteworthy that the findings required to trigger the § 3142(d) 10-day detention

13   period – that the defendant poses a risk of flight or dangerousness, see § 3142(d)(2), – mirror the

14   findings required to detain a defendant under the BRA.  See § 3142(f)(2)(A) (requiring that the

15   government show "a serious risk that such person will flee" to trigger a detention hearing); id. at

16   § 3142(e)(1) (requiring pretrial detention only if "the judicial officer finds that no condition or

17   combination of conditions will reasonably assure the appearance of the person as required and

18   the safety of any other person and the community").  Therefore, in any case where the

19   government believes that a noncitizen defendant[11] poses a risk of flight or danger, the BRA

20   envisions that the government will proceed by either (1) seeking temporary detention under

21   § 3142(d) to prioritize the defendant's transfer to civil immigration custody for purposes of

22   removal; or by (2) seeking a detention hearing pursuant to § 3142(f) to make the case for pretrial

23   criminal detention under the standards imposed by § 3142(e).[12]

24   _____

25       [11]  The provisions of § 3142(d) do not apply if a defendant has been "lawfully admitted for permanent residence."  § 3142(1)(B).

26       [12]  Here, the government was well aware of the distinct pathways available to them in this case.
27   Indeed, the temporary 10-day detention period authorized by § 3142(d) is the first option listed
     in the form used by the government to request defendant's detention.  (Dkt. 3, Notice of Request
28   for Detention at 1).  The government did not check that box, opting instead to check the boxes

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 19 of 29    Page ID
#:540
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 18 of 28    Page ID
#:508

1    Second, the BRA accounts for the possibility that the agencies will reevaluate their

2    positions or fail to coordinate their actions.  If the government initially elected to seek the 10-day

3    temporary detention under § 3142(d), but the immigration "official fails or <u>declines</u> to take such

4    person into custody during that period," the BRA requires that the person be evaluated for pretrial

5    release like any other defendant, "<u>notwithstanding</u> the applicability of other provisions of law

6    governing . . . deportation."  § 3142(d) (emphases added).  The failure by the government to

7    transfer a defendant to immigration custody during the designated period therefore carries

8    significant weight:  if such transfer is not completed, "the BRA applies, [and] statutes governing

9    detention related to immigration proceedings do not."  <u>Rangel</u>, 318 F.Supp.3d at 1218; <u>see</u>

10   <u>Trujillo-Alvarez</u>, 900 F.Supp.2d at 1179 ("If, however, ICE declines to take custody of Mr. Alvarez-

11   Trujillo for the purpose of removing or deporting him, then, as Congress plainly declared in the

12   BRA, such a person shall be treated 'in accordance with the other provisions' of that law, which

13   require his pretrial release subject to the conditions imposed by [the Magistrate Judge].").

14   B.    <u>Failure to Adhere to the Process Crafted by § 3142(d) Can Jeopardize a</u>

15         <u>Defendant's Constitutional Rights</u>.

16   Although the framework crafted by Congress envisions careful coordination between

17   executive agencies, the government jeopardizes this balance by proceeding, as it did here, with

18   the simultaneous prosecution and removal of a defendant.  In this case, the government did not

19   seek the temporary detention period authorized under § 3142(d).  (<u>See</u>, <u>generally</u>, Dkt. 3, Notice

20   of Request for Detention).  Because the § 3142(d) 10-day detention period was never triggered,

21   neither was the clause requiring that Mr. Parias "be treated in accordance with the other

22   provisions of [the BRA], notwithstanding the applicability of" the laws governing his deportation.

23   <u>See</u> 8 U.S.C. § 3142(d).  Instead, the government solely sought the detention of Mr. Parias

24   pursuant to § 3142(e) and § 3142(f), (Dkt. 3, Notice of Request for Detention at 2-3), apparently

25   prioritizing Mr. Parias's prosecution over its earlier efforts to arrest him in connection with

26   immigration proceedings.

27   _____

28   associated with a request for detention pursuant to §§ 3142(e)-(f).  (<u>See</u> <u>id.</u> at 2-3).

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 20 of 29    Page ID
#:541
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 19 of 28    Page ID
#:509

Despite the government's apparent choice, it is undisputed that on November 24, 2025, Mr. Parias was transferred from the custody of the U.S. Marshal to ICE on the basis of an immigration detainer issued on October 22, 2025. (See Dkt. 34, November 24, 2025 Custody Notice at ¶ 1); (Dkt. 30, November 21, 2025 Custody Notice at ¶ 1). Thus, when the court ordered Mr. Parias's release under the conditions imposed by Magistrate Judge Chooljian, he was released from the custody of the U.S. Marshals and immediately transferred to ICE custody – disrupting the balance between prioritizing prosecution or removal.

"[T]he purpose of an ICE detainer is for 'arresting and removing the alien.'" Trujillo-Alvarez, 900 F.Supp.2d at 1176 (quoting 8 C.F.R. § 287.7(a)). Therefore, the government's decision to detain Mr. Parias pursuant to an ICE detainer indicates that the government had apparently reversed its priorities, choosing instead to seek Mr. Parias's forthwith removal. But this disruption of defendant's ongoing criminal proceedings is troubling because the government has not asserted that Mr. Parias is the subject of a final order of removal, or even whether removal proceedings have been initiated against him. (See, generally, Dkt. 61, Opposition). As noted earlier, law enforcement first sought to detain Mr. Parias on October 21, 2025, "because [he] was the subject of an administrative arrest warrant issued in conjunction with a federal immigration proceeding[.]" (See Dkt. 1, Complaint, Early Affidavit at ¶ 5). Specifically, "[o]n or about October 19 and 20, 2025, law enforcement sought and obtained an I-200 administrative warrant for defendant's arrest because defendant is a citizen and national of Mexico who does not have lawful status in the United States and therefore is subject to removal." (Dkt. 61, Opposition at 2). Yet standing alone, the I-200 administrative warrant does not constitute dispositive evidence that removal proceedings have been initiated against a person. See Ochoa v. Campbell, 266 F.Supp.3d 1237, 1256 (E.D. Wash. 2017) ("The administrative warrant is not a final order of removal. . . . It is a document reflecting ICE's intent to arrest [defendant] on suspicion that he is unlawfully present in the country."); Yith v. Nielsen, 881 F.3d 1155, 1167 n. 6 (9th Cir. 2018) ("DHS's Form I-200, entitled 'Warrant of Arrest, United States Department of Homeland Security,' is distinct from Form I-862, entitled 'Notice to Appear, United States Department of Homeland Security.'"). Rather, "[t]he form I-200 is a 'check the box' form that offers five different probable

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 21 of 29    Page ID
#:542
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 20 of 28    Page ID
#:510

cause bases for removal[,]" including "that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law[.]" United States v. Gomez-Robles, 2017 WL 6558595, *2 (D. Ariz. 2017). Because a copy of the I-200 administrative warrant for Mr. Parias's arrest is not part of the record, its mere existence offers the court no information about whether Mr. Parias is in removal proceedings.

Generally, even the existence of a prior removal order or ongoing removal proceedings would not force the government's hand in disrupting ongoing criminal proceedings. This is because "[r]einstatement of a prior order of removal is neither automatic nor obligatory. ICE may decide to forego reinstatement for a variety of reasons, including but not limited to the exercise of prosecutorial discretion." Santos-Flores, 794 F.3d at 1091 (internal citations omitted); see 8 C.F.R. § 287.7(a) ("Any authorized immigration officer may at any time issue a Form I-247, Immigration Detainer–Notice of Action, to any other Federal, State, or local law enforcement agency.") (emphasis added); see, e.g., Trujillo-Alvarez, 900 F.Supp.2d at 1172 ("An Assistant Field Office Director with ICE Enforcement and Removal Operations testified that ICE has the discretion whether to execute on such a detainer."). Indeed, the Ninth Circuit has recognized the government's discretion to prioritize criminal prosecution over removing a criminal defendant, and has, in the BRA context, disapproved of efforts by the government to wield this discretion unfairly. See Santos-Flores, 794 F.3d at 1091 ("Having made this choice, however, the government may not use its discretionary power of removal to trump a defendant's right to an individualized determination under the Bail Reform Act."). The court finds this principle to be no less important here.

However, the government argues that Mr. Parias is now detained pursuant to § 1226(c)(1)(E), which mandates both the issuance of an immigration detainer and Mr. Parias's civil detention. (See Dkt. 61, Opposition at 4); 8 U.S.C. §§ 1226(c)(1)(E), (c)(3). The collision between Mr. Parias's release on bond and his mandatory immigration detention underscores the impact of the government's failure to invoke § 3142(d) in its request for detention, and its subsequent inability to prioritize prosecution or removal under the structure provided by that subsection. Moreover, while the government may point to § 1226(c)(1)(E) as the purported

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 22 of 29    Page ID
#:543
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 21 of 28    Page ID
#:511

1    authority for Mr. Parias's civil detention, it is clear that Mr. Parias is being held in immigration

2    custody for the purpose of securing his presence in his ongoing criminal prosecution.  (See Dkt.

3    61, Opposition at 10) (arguing that "the government has already coordinated with ERO to ensure

4    defendant's transportation from ICE custody to criminal proceedings in this matter and will

5    continue to do so").  In short, the government's failure to coordinate the overlapping actions of its

6    separate agencies while relentlessly pursuing Mr. Parias's criminal proceedings created a

7    situation from which constitutional violations could – and did – occur.

8         Specifically, the government's decision to administratively detain Mr. Parias in Adelanto is

9    when and where the constitutional violations began in this case.  As in Trujillo-Alvarez, Mr.

10   Parias's detention has "deprived him and his court-appointed counsel of the ability to meet and

11   work together to prepare for his defense at trial without undue inconvenience or hardship, thereby

12   jeopardizing" his constitutional rights.  900 F.Supp.2d at 1180.  The problem, therefore, is not that

13   the BRA and the INA are irreconcilable; instead, "[t]he problem here is . . . that two Article II

14   agencies will not coordinate their respective efforts.  The Executive, in the person of the Attorney

15   General, wishes to prosecute defendant.  The same Executive, in the person of the Assistant

16   Secretary of Homeland Security for ICE, may want to deport him."  United States v. Barrera-

17   Omana, 638 F.Supp.2d 1108, 1111-12 (D. Minn. 2009).

18        The government's decision to detain Mr. Parias in Adelanto "does not mean, however, that

19   this Court is powerless to prevent the Executive Branch from ignoring its obligations" under the

20   Constitution.  See Trujillo-Alvarez, 900 F.Supp.2d at 1180.  Instead, as the Ninth Circuit

21   instructed, "[i]f the government, by placing [defendant] in immigration detention or removing him,

22   jeopardizes the district court's ability to try him, then the district court may craft an appropriate

23   remedy."  Santos-Flores, 794 F.3d at 1091.[13]  In support of this conclusion, the Ninth Circuit

24   favorably cited the discussion of remedies in Trujillo-Alvarez, where the district court concluded

25

26        [13]  The government cites the Santos-Flores decision only once, as putative support for the
27   government's proposed remedy, (see Dkt. 61, Opposition at 10), which, as noted below, is
     unpersuasive.  Indeed, the government's Opposition fails to adequately address the Ninth Circuit's
28   decision in Santos-Flores, particularly its approval of Trujillo-Alvarez.

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 23 of 29    Page ID
#:544
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 22 of 28    Page ID
#:512

that dismissal with prejudice would be appropriate if the Executive Branch jeopardized the defendant's statutory and constitutional rights by continuing to detain him in immigration custody notwithstanding his impending trial.  See id. (citing Trujillo-Alvarez, 900 F.Supp.2d at 1179-81). The Ninth Circuit's guidance in Santos-Flores is clearly applicable where, as here, the government has jeopardized this court's ability to try Mr. Parias in compliance with the demands of the Sixth Amendment by placing him in immigration detention.  No further finding or ruling is needed.

The court therefore rejects as inapposite the government's reliance on non-binding, out-of-circuit cases like United States v. Soriano Nunez, 928 F.3d 240 (3d Cir. 2019), United States v. Lett, 944 F.3d 467 (2d Cir. 2019), United States v. Baltazar-Sebastian, 990 F.3d 939 (5th Cir. 2021), United States v. Veloz-Alonso, 910 F.3d 266 (6th Cir. 2018), United States v. Pacheco-Poo, 952 F.3d 950 (8th Cir. 2020), and United States v. Vasquez-Benitez, 919 F.3d 546 (D.C. Cir. 2019).  (See Dkt. 61, Opposition at 6-7).  Those cases merely stand for the general proposition that the BRA does not preclude the government from exercising its independent detention authority under the INA, but say nothing about a district court's authority to craft appropriate remedies for constitutional violations occasioned by the administrative detention of a criminal defendant.[14]  Thus, any suggestion that those cases require the court to deny defendant's Application would "misunderstand[] the defense's argument" and this court's reasoning, because "[t]he matter at issue here is whether Mr. Parias's remote immigration detention, whether legally justified or not, is functionally depriving him of access to counsel and interfering with his right to prepare for his defense for trial[.]"  (Dkt. 63, Reply at 3).

Further, these cases largely appear to take at face value that detention by ICE of a criminal defendant will always be done "for the permissible purpose of effectuating his removal and not to skirt [the] Court's decision [in] setting the terms of [his] release under the BRA[.]"  Vasquez-Benitez, 919 F.3d at 552 (internal quotation marks omitted).  The government reiterates this point by quoting United States v. Diaz-Hernandez, 943 F.3d 1196 (9th Cir. 2019) for the proposition that

---

[14]  Indeed, while the Fifth Circuit broached the topic in Baltazar-Sebastian, it did so only to note that "the [district] court did not conclude that ICE's detention of Baltazar violated her constitutional right to a fair trial, which would include assistance of counsel."  990 F.3d at 947.

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 24 of 29    Page ID
#:545
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 23 of 28    Page ID
#:513

1    "detention of a criminal defendant pending trial pursuant to the Bail Reform Act and detention of

2    a removable alien pursuant to the Immigration and Nationality Act are separate functions that

3    serve separate purposes and are performed by different authorities."[15]  (See Dkt. 61, Opposition

4    at 1) (quoting Diaz-Hernandez, 943 F.3d at 1199).  But as the Ninth Circuit has also recognized,

5    "federal immigration officers and federal prosecutors work together closely to facilitate criminal

6    prosecutions of aliens."  Zavala v. Ives, 785 F.3d 367, 372 (9th Cir. 2015).  As a result of that

7    collaboration, it is not uncommon for "ICE [to] detain[] an alien for the purpose of securing his

8    presence at a potential criminal prosecution[.]"  See id. at 371.  Accordingly, "[t]he Ninth Circuit,

9    as well as many other circuits, recognize an exception to the application of the [Speedy Trial Act]

10    where a defendant's detention by immigration officials is a 'mere ruse[] to detain a defendant for

11    later criminal prosecution.'"  United States v. Mejia Hernandez, 2020 WL 1181495, *3 (C.D. Cal.

12    2020) (quoting United States v. Cepeda-Luna, 989 F.2d 353, 355 (9th Cir. 1993)).  And the Ninth

13    Circuit has also recognized that for the purposes of computing sentencing credits, "[w]hen ICE

14    detains an alien pending a potential criminal prosecution, electing to defer deportation until the

15    conclusion of such criminal proceedings (and often until after service of the criminal sentence),

16    that period of ICE detention is causally attributable to the criminal offense rather than to ICE's

17    authority to detain an alien pending deportation."  Zavala, 785 F.3d at 371.

18        Here, it is clear that Mr. Parias is being detained by ICE for the purpose of securing his

19    presence at his ongoing criminal prosecution.  (See Dkt. 61, Opposition at 10) ("[T]he government

20    has already coordinated with ERO to ensure defendant's transportation from ICE custody to

21    criminal proceedings in this matter and will continue to do so.").  Although Mr. Parias was

22

23

24

25       [15]  While the government relies on Diaz-Hernandez throughout its Opposition, that decision

26    does not dictate the result in this case.  Diaz-Hernandez merely stands for the conclusion that a
  "district court, addressing whether pre-trial detention is appropriate under the Bail Reform Act,

27    may not speculate as to what may or may not happen in the future to the defendant under a
  different statutory and regulatory regime."  943 F.3d at 1199.  By contrast, this case is about the

28    violation of Mr. Parias's Sixth Amendment right to counsel caused by his detention in ICE custody.

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 25 of 29    Page ID
#:546
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 24 of 28    Page ID
#:514

1  transferred to ICE custody over a month ago,[16] (November 24, 2025 Custody Notice at ¶ 1), as

2  of the date of this Order, he has not been removed from the country.[17]  Instead, he has been

3  brought to court twice in connection with his criminal proceedings.  (See Dkt. 49, Court's Order

4  of December 4, 2025); (Dkt. 52, Court's Order of December 9, 2025).  As the Ninth Circuit held

5  in Zavala, "[w]here ICE retains an alien in custody subsequent to an indictment or the filing of

6  criminal charges and the alien is then convicted of those charges, . . . the intervening period of

7  detention is presumed to be for the purpose of criminal prosecution[.]").  785 F.3d at 378.

8        Mr. Parias's case highlights the unavoidable problem that emerges when ICE detains a

9  criminal defendant granted bail under the BRA for the plainly impermissible "purpose of securing

10

11

12  [16]  The government argues that Mr. Parias is currently detained by ICE pursuant to § 1226(c)(1)(E), enacted by the Laken Riley Act ("LRA"), Pub. L. No. 119-1, 139 Stat. 3 (2025).

13  (See Dkt. 61, Opposition at 4).  The government ties the applicability of that subsection to the fact that Mr. Parias was charged for the conduct giving rise to the instant offense, (see id.) ("Defendant

14  is administratively detained under 8 U.S.C. § 1226(c)(1)(E), which, as relevant here, provides [for the detention of certain noncitizens] charged with, [or] arrested for . . . offenses including 'assault

15  of a law enforcement officer.'"), implying that this provision only began to apply as a result of these criminal proceedings.  This argument – which the government raised for the first time on

16  December 12, 2025, (see Dkt. 61, Opposition at 4), does not alter the court's Sixth Amendment analysis.  Nor does it disturb the court's finding that detaining a criminal defendant in ICE custody

17  for the purposes of his criminal prosecution can create conditions susceptible to constitutional and statutory violations.  Indeed, by requiring the mandatory detention of certain individuals who have

18  merely been charged with a crime, the LRA appears to invade the province of the BRA, which requires "that any person charged with an offense under the federal criminal laws shall be

19  released pending trial, subject to appropriate conditions, unless a 'judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as

20  required and the safety of any other person and the community[.]"  Santos-Flores, 794 F.3d at 1090 (emphasis added); see also Matthew Vogel, Immigration Interference: How Immigration Law

21  Creates a Shadow Criminal Legal System, 47 U. Ark. Little Rock L. Rev. 611, 635 (2025) ("The LRA . . . purports to require the arrest and detention of certain noncitizens released from criminal

22  custody who have themselves only been charged with certain enumerated offenses . . . .  The LRA effectively assumes guilt and dangerousness of people already released in their criminal

23  case and purports to require mandatory detention without a showing of any evidence apart from the existence of the charges[.]") (emphasis added).

24

25  [17]  This delay is noteworthy given that Mr. Parias is a citizen of Mexico, (see Dkt. 61,

26  Opposition at 2), and Mexican citizens are typically removed expeditiously from this District – often

27  within 48 hours when, for example, they are subject to prior orders of removal that can be quickly reinstated.  See, e.g., Mejia Hernandez, 2020 WL 1181495, at *2 ("Removable aliens from Mexico

28  are ordinarily deported on the same day or the day after the reinstatement order is signed.").

1    his appearance at a criminal trial without satisfying the requirements of the BRA."  See Trujillo-

2    Alvarez, 900 F.Supp.2d at 1179.  In such situations, ICE must, at minimum, ensure that a criminal

3    defendant is able to exercise all of his or her constitutional rights.  Where ICE instead

4    impermissibly impinges on such rights – for example, by placing more stringent barriers on a

5    detainee's ability to meet with his criminal defense counsel as opposed to his immigration counsel

6    – it would be unremarkable for "the district court [to] craft an appropriate remedy[.]"  See Santos-

7    Flores, 794 F.3d at 1091.

8    III.    REMEDY.

9           Although the government correctly notes that the remedy for a Sixth Amendment violation

10   "should be tailored to the injury suffered from the constitutional violation[,]" (Dkt. 61, Opposition

11   at 9) (quoting Morrison, 449 U.S. at 364, 101 S.Ct. at 668), the government has not suggested

12   a viable remedial alternative to dismissal.  To the contrary, the three remedies it has suggested

13   are plainly insufficient.   First, during the December 9, 2025, hearing, the government

14   recommended that the court reverse its ruling under the BRA in order to secure defendant's

15   detention in downtown Los Angeles, thus alleviating the access to counsel issue.  (December 9,

16   2025, Hearing RT at 13).  But vindication of Mr. Parias's constitutional rights cannot come at the

17   expense of his rights under the BRA.  See Lopez-Valenzuela v. Arpaio, 770 F.3d 772, 777 (9th

18   Cir. 2014) ("The Supreme Court has long recognized constitutional limits on pretrial detention.");

19   United States v. Salerno, 481 U.S. 739, 747, 107 S.Ct. 2095, 2101-02 (1987) ("The arrestee is

20   entitled to a prompt detention hearing, and the maximum length of pretrial detention is limited by

21   the stringent time limitations of the Speedy Trial Act.") (citation omitted);  Hebbe v. Pliler, 627 F.3d

22   338, 343 (9th Cir. 2010) ("[A]n inmate cannot be forced to sacrifice one constitutionally protected

23   right solely because another is respected.") (internal quotation marks omitted).

24          Second, the government appears to suggest that transporting Mr. Parias from ICE custody

25   to his criminal proceedings will ameliorate any infringement upon his constitutional rights.

26   (See Dkt. 61, Opposition at 10).  But merely ensuring Mr. Parias's physical presence in the

27   courtroom when required would do nothing to cure the specific constitutional deprivation at issue,

28   i.e., the effective denial of counsel for Mr. Parias during the critical period prior to trial.  "[T]he

25

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 27 of 29    Page ID
#:548
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 26 of 28    Page ID
#:516

1   [U.S. Supreme] Court has . . . recognized that the assistance of counsel cannot be limited to

2   participation in a trial; to deprive a person of counsel during the period prior to trial may be more

3   damaging than denial of counsel during the trial itself." Moulton, 474 U.S. at 170, 106 S.Ct. at

4   484. Specifically, this remedy would do nothing to address ICE's practice of denying criminal

5   defense attorneys equivalent access to their clients in ICE custody as is provided to immigration

6   attorneys. Nor would it cure ICE's apparent inability or refusal to accommodate criminal defense

7   counsel's requests for VTC or legal calls in a reasonably timely manner. Finally, the government

8   suggests that defendant's access to counsel problems could be remedied through a continuance

9   of his trial. (Dkt. 61, Opposition at 1). But this proposed remedy would require Mr. Parias, as

10  then-District Judge Mendoza stated, "to choose between his Sixth Amendment right to consult

11  with counsel to prepare an effective defense and his right to a speedy trial." Rangel, 318

12  F.Supp.3d at 1220. The court declines to place Mr. Parias in the position of needing to choose

13  between his constitutional rights. See id. (explaining that dismissal was required rather than

14  permitting prosecution to continue where doing so would force defendant to "choose between his

15  Sixth Amendment right to consult with counsel . . . and his right to a speedy trial.").

16       In short, because the deprivation of Mr. Parias's access to counsel during the critical period

17  prior to his trial caused him actual and threatened prejudice, and because no other remedy could

18  adequately cure his deprivation, the court agrees with defendant that dismissal of the indictment

19  is warranted.[18]  See Barrera-Moreno, 951 F.2d at 1092 ("Dismissal is appropriate when the

20

----

21       [18]  The government cites to United States v. Yostin Sleiker, et al., ED 25-MJ-140 (Dkt. 26,
22  Court's Order of April 8, 2025), for the proposition that dismissal is premature at this stage. (Dkt.
    61, Opposition at 10). But Sleiker offers the government no support for its contention. In a
23  hearing held on April 8, 2025, Judge Kato declined to rule on a motion to dismiss filed under
    comparable circumstances – but only because "the circumstances and facts regarding
24  [defendant's] detention by ICE kept changing[,]" as the defendant was being moved to
    different ICE detention centers. (See Sleiker, ED 25-MJ-140, Dkt. 34, RT at 3). But a week later,
25  the court sought to dismiss the complaint given the ongoing violation of the defendant's Sixth
    Amendment rights caused by his transfer to an ICE detention center in Texas. (See id. at 5-8,
26  10). While the court's intention to dismiss the complaint was mooted by the filing of an indictment,
    (see id. at 11-13), the court nevertheless expressed its view that the Sixth Amendment violation
27  warranted dismissal. Ultimately, the court granted the government's own motion to dismiss the
    indictment. (See United States v. Gutierrez Contreras, et al., ED CR 25-0121-1, Dkt. 36, Court's
28

Case 2:25-cr-00904-FMO    Document 79    Filed 12/30/25    Page 28 of 29    Page ID
#:549
Case 2:25-cr-00904-FMO    Document 76    Filed 12/27/25    Page 27 of 28    Page ID
#:517

1  investigatory or prosecutorial process has violated a federal constitutional or statutory right and

2  no lesser remedial action is available.").  Therefore, the only issue left to resolve is whether the

3  dismissal should be with prejudice.

4      The court takes seriously the Ninth Circuit's admonition that "dismissal of the indictment

5  [i]s the most severe sanction," see Chapman, 524 F.3d at 1088, and that dismissal with prejudice

6  "encroaches on the prosecutor's charging authority."  Id. at 1085.  But under the circumstances,

7  dismissal without prejudice is insufficient because it risks repeating the same prejudice against

8  Mr. Parias, and unjustly allows the government a second opportunity to correct its prosecutorial

9  shortcomings.  First, nothing in the record indicates that the government would coordinate with

10  ICE to uphold Mr. Parias's Sixth Amendment right to counsel if a new prosecution were brought.

11  To the contrary, the government's demonstrated inability to do so raises the likelihood that the

12  present course of events would simply repeat themselves.

13      Second, permitting the government to re-prosecute the case – with timely production of

14  discovery, compliance with the court's deadlines, and adherence to its disclosure obligations –

15  would be inappropriately prejudicial toward defendant, as this "remedy would advantage the

16  government, probably allowing it to salvage what" appears to be "a poorly conducted prosecution."

17  See Chapman, 524 F.3d at 1087; see, e.g., id. ("[T]he case as originally prosecuted appeared to

18  the district court to have been faltering.  Therefore, the district court did not abuse its discretion

19  in concluding that a dismissal was the only means of avoiding prejudice to the Defendants.").

20  Therefore, the court concludes that "no lesser remedial action is available," Barrera-Moreno, 951

21  F.2d at 1092, and that the indictment must be dismissed with prejudice.  See Chapman, 524 F.3d

22  at 1080, 1085, & 1087 (holding that district court did not abuse its discretion by dismissing

23  indictment with prejudice under its supervisory powers where district court found that

24  government's discovery violations subverted a defendant's due process and Sixth Amendment

25  rights); United States v. Camacho-Porchas, 2021 WL 6503722, *5 (D. Ariz. 2021) (dismissing

26  indictment with prejudice where government violated defendant's Sixth Amendment right to

27  _____

28  Order of April 22, 2025).

1  counsel by deporting them prior to trial); see also Trujillo-Alvarez, 900 F.Supp.2d at 1181

2  (signaling that the court would dismiss an indictment with prejudice where his continued detention

3  in ICE custody two weeks before his trial threatened defendant's constitutional rights).

### CONCLUSION

5  Based on the foregoing, IT IS ORDERED THAT defendant's Ex Parte Application

6  **(Document No. 54)** is **granted**.  The indictment is hereby dismissed with prejudice.  Judgment

7  shall be entered accordingly.

8  Dated this 27th day of December, 2025.

10                                                                   /s/
                                                     _____
11                                                        Fernando M. Olguin
                                                     United States District Judge